UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**UNITED STATES OF AMERICA,**

          Plaintiff,

                                **HONORABLE AVERN COHN**

    v.

                                **No. 06-20122**

**D-8 JACK V. GIACALONE,**

          Defendant.
_____/


**JURY TRIAL (EXCERPT)**

**Wednesday, April 25, 2007**


Appearances:

Keith E. Corbett              Neil H. Fink
U.S. Attorney's Office       Law Offices of Neil H. Fink
211 W. Fort Street, #2300    185 Oakland Avenue, #250
Detroit, Michigan  48226     Birmingham, Michigan  48009
(313) 226-9100              (248) 258-3181
  On behalf of Plaintiff       On behalf of Defendants

-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)234-2604 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software*

*Jury Trial (Excerpt)*
*Wednesday, April 25, 2007*

# I N D E X

- - -

Government's Case in Chief        Page   Vol.

**Don Julius Deseranno**

    Direct Examination By Mr. Corbett:    3    2

    Cross-Examination By Mr. Fink    29    2

    Redirect Examination By Mr. Corbett:    46    2

Certification of Reporter ......................52

- - -

# E X H I B I T S

Number      Description        Id'd Rcvd Vol.

***None Marked, Offered or Received***

- - -

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                              3

1              Detroit, Michigan

2              Wednesday, April 25, 2007

3                   -   -   -

4         (Beginning of excerpt.)

5              **THE COURT:**  In front of me, sir.  Raise your right

6    hand.

7                   -   -   -

8                   **DON JULIUS DESERANNO,**

9         being first duly sworn by the Court to tell

10        the truth, was examined and testified upon his

11        oath as follows:

12             **THE COURT:**  Take that seat.

13                  -   -   -

14                  **DIRECT EXAMINATION**

15   **BY MR. CORBETT:**

16   **Q.**  Sir, would you please state your name and then spell

17   your last name for the court reporter.

18             **THE COURT:**  Excuse me.  For scheduling purposes,

19   how long do you anticipate your direct?

20             **MR. CORBETT:**  It's possible I could finish by

21   about 12:00, Your Honor.  Half an hour, 45 minutes.

22             **THE COURT:**  Okay.  Thank you.  Go ahead.

23   **BY MR. CORBETT:**

24   **Q.**  Sir, would you please state your name and then spell

25   your last name for the court reporter.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                                    4

1   **A.**   Don Deseranno, D-e-s-e-r-a-n-n-o.

2   **Q.**   And, Mr. Deseranno, are you presently working or

3   employed?

4   **A.**   No.

5            **THE COURT:**  Pull the mic a little closer to you,

6   would you?  The seat doesn't move.

7   **BY MR. CORBETT:**

8   **Q.**   Mr. Deseranno, do you recall in approximately December

9   of the year 2005 being approached by two FBI agents?

10  **A.**   Yes.

11  **Q.**   And would you tell the ladies and gentlemen of the jury

12  where they approached you?

13  **A.**   They came to my home in Fort Lauderdale, Florida.

14  **Q.**   And did they have a grand jury subpoena with them?

15  **A.**   Yes.

16  **Q.**   And did they serve that grand jury subpoena upon you?

17  **A.**   Yes.

18  **Q.**   And subsequent to the service of that grand jury

19  subpoena, did you contact an attorney?

20  **A.**   Yes, I did.

21  **Q.**   And your attorney's name was?

22  **A.**   Marty Crandall.

23  **Q.**   And that grand jury subpoena called for you to appear

24  in front of a federal grand jury; is that correct?

25  **A.**   Yes.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                          5

1    **Q.**   And did you discuss the grand jury subpoena with

2    Mr. Crandall?

3    **A.**   Yes.

4    **Q.**   And did Mr. Crandall contact -- did Mr. Crandall advise

5    you that he was going to contact the U.S. Attorney's Office?

6    **A.**   Yes.

7    **Q.**   And do you know whether or not as a result of

8    Mr. Crandall's contact you were given court-authorized

9    immunity?

10   **A.**   Yes, I was, on his suggestion.

11   **Q.**   And that compelled you to testify before the grand

12   jury; is that correct?

13   **A.**   Yes.

14        **MR. CORBETT:**  Your Honor, per a stipulation with

15   Mr. Fink, I'm going to read into the record the actual

16   immunity order tendered to Mr. Deseranno, and then we'll

17   provide a hard copy as an exhibit for the jury.

18        **THE COURT:**  Okay.  Go ahead.

19        **MR. CORBETT:**  It reads:

20        "In Re: Grand Jury Investigation 04-4-3,

21   Miscellaneous Number 04-74750-C, Ordered to testify pursuant

22   to Title 18 United States Code Section 6002, 6003.

23        "Upon the motion of Stephen J. Murphy,

24   United States Attorney, and Keith E. Corbett, Assistant

25   United States Attorney, both for the Eastern District of

*06-20122; U.S.A. v. Jack V. Giacalone*

1    Michigan, and it appearing to their satisfaction that

2    Don Julius Deseranno, hereinafter referred to as the

3    witness, will be called to testify and provide other

4    information before a special grand jury of the United States

5    presently impaneled and hearing testimony and evidence

6    within the Eastern District of Michigan; and

7              "2.  In the judgment of the attorneys for the

8    Government, the witness is likely to refuse to testify or

9    provide other information on the basis of the witness'

10   privilege against self-incrimination; and

11             "3.  In the judgment of the attorneys for the

12   Government, the testimony or other information from the

13   witness may be necessary to the public interest; and

14             "4.  The aforesaid motion filed herein has been

15   made with the approval of John C. Keeney, Deputy Assistant

16   Attorney General of the Criminal Division of the

17   United States Department of Justice, pursuant to the

18   authority invested in him by Title 18 United States Code

19   Section 6003(B) and Title 28 Code of Federal Regulations

20   Section 0.175(A).

21             "Now, therefore, it is hereby ordered, pursuant to

22   Title 18 United States Code Section 6002 and 6003 that the

23   witness give such testimony and provide other information

24   which the witness is likely to refuse to give or provide on

25   the basis of the witness' privilege against

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                                    7

1    self-incrimination as to all matters in question which the

2    witness may be interrogated about before the special grand

3    jury and in any trial or other proceedings resulting

4    therefrom or ancillary thereto.

5         "No testimony or other information compelled under

6    this order or any information directly or indirectly derived

7    from any such testimony or other information may be used

8    against the witness in any criminal case or subject the

9    witness to any penalty or forfeiture except for a

10   prosecution for perjury, giving false statements or

11   otherwise failing to comply with this order.

12        "It is further ordered that the motion and order

13   to testify in all related proceedings be sealed and not

14   opened unless and until the further order of this Court."

15        That is signed by the Honorable Gerald E. Rosen,

16   dated December 12, 2005.

17   **BY MR. CORBETT**

18   **Q.**   Do you remember being provided a copy of that order or

19   your attorney being provided with a copy of that order?

20   **A.**   Yes.

21   **Q.**   And it was under the terms and conditions of that order

22   that you testified before a federal grand jury; is that

23   correct?

24   **A.**   Yes.

25   **Q.**   And it is under the terms and conditions of that order

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    8

1    that you are appearing and testifying here today; is that

2    correct?

3    **A.**   Yes.

4    **Q.**   Sir, do you know a gentleman by the name of

5    Peter Tocco?

6    **A.**   Yes.

7    **Q.**   And would you tell the ladies and gentlemen of the

8    grand jury how long you have known Mr. Tocco and under what

9    circumstances you first met him?

10   **A.**   I knew him from high school.

11           **THE COURT:**  You have got to bring the mic closer

12   to you or keep your voice up.

13           **THE WITNESS:**  I knew him from high school.

14   **BY MR. CORBETT:**

15   **Q.**   So you went to high school with Mr. Tocco?

16   **A.**   Yes.

17   **Q.**   What high school was that?

18   **A.**   Austin.

19   **Q.**   Do you know a gentleman by the name of Dave Aceto?

20   **A.**   Yes.

21   **Q.**   And how long have you known Mr. Aceto?

22   **A.**   Some 20 years.

23   **Q.**   Do you remember how it is -- at this time do you

24   remember how it is that you met Mr. Aceto?

25   **A.**   No.

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                           9

1   **Q.**   Okay.  Do you know a gentleman by the name of Jack V.

2   Giacalone?

3   **A.**   Yes.

4   **Q.**   And how long have you known Mr. Giacalone?

5   **A.**   Again, some 20 years or so.

6   **Q.**   And is Mr. Giacalone presently in the courtroom today?

7   **A.**   Yes.

8   **Q.**   Would you please point him out to the ladies and

9   gentlemen of the jury and tell us what he's wearing today.

10  **A.**   Wait a minute.  There.

11  **Q.**   Well, if you recognize him, point him out.

12  **A.**   I don't recognize him.

13  **Q.**   Sir, I would like to show you what's been marked for

14  identification purposes as Government's Proposed Exhibit

15  Number 18 and 19 and ask you to identify the person in those

16  photos.

17  **A.**   Yes.  That's Jack Giacalone.

18  **Q.**   Do you see someone in the courtroom that looks like

19  that now?  Do you need glasses?

20  **A.**   No, I don't.  Sitting at the table.

21  **Q.**   What's he wearing?

22  **A.**   A gray suit.

23          **MR. CORBETT:**  May the record reflect that the

24  witness has identified the Defendant Jack V. Giacalone.

25

*06-20122; U.S.A. v. Jack V. Giacalone*

1    **BY MR. CORBETT**

2    **Q.**   All right, sir.  I would like to draw your attention

3    back to a period of time in the late 1980's.  Did you at

4    that time have occasion to deal with a gentleman by the name

5    of John Viraldi?

6    **A.**   Yes.

7              **THE COURT:**  John what?

8              **MR. CORBETT:**  John Viraldi.

9              **THE COURT:**  Spell it.

10             **MR. CORBETT:**  V-e-r-a-l-d-i, I believe.  V-i-r,

11   I'm sorry.  V-i-r-a-l-d-i.

12   **BY MR. CORBETT:**

13   **Q.**   And, sir, would you describe the nature of the

14   relationship between you and Mr. Viraldi?

15   **A.**   John was a bookmaker, and I bet sports with him.

16   **Q.**   All right.  So you were involved in betting sports, and

17   Mr. Viraldi was a bookmaker with whom you bet; is that

18   correct?

19   **A.**   Yes.

20   **Q.**   And, sir, could you give the ladies and gentlemen of

21   the jury an idea, we're going back to the late 1980s or

22   early 1990s, of how much money you were losing betting in a

23   given year at that point in time?  Ballpark estimate.

24   **A.**   Over a year 50 to 100 thousand dollars.

25   **Q.**   Did you sometimes lose more than that?

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    11

1   **A.**   It went up and down.

2   **Q.**   Sometimes more?

3   **A.**   Once in a while.

4   **Q.**   All right.  In addition to utilizing the services of

5   Mr. Viraldi to place bets, did you ever have occasion to be

6   involved in any other gambling activities with Mr. Viraldi?

7   **A.**   Yes.

8   **Q.**   Specifically, again, drawing your attention to the late

9   '80s, did you have occasion to be involved in a high stakes

10  poker game?

11  **A.**   No.

12  **Q.**   You did not play a card game of any kind?

13  **A.**   Yes.

14  **Q.**   What kind of card game?

15  **A.**   Blackjack.

16  **Q.**   And where did these blackjack games take place?

17  **A.**   It was in Florida.

18  **Q.**   And did you also subsequently engage in the same kind

19  of games with him in the Detroit metropolitan area?

20  **A.**   Yes.

21  **Q.**   And did you lose money in connection with those games?

22  **A.**   Yes.

23  **Q.**   Approximately how much money did you lose?

24  **A.**   In each of those I don't recall, but 50 to 75 thousand.

25  **Q.**   Did you subsequently have occasion to learn that those

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                                    12

1    games --

2              **MR. FINK:**  Objection, hearsay.  I mean, he can

3    talk about his state of mind, what he thought.

4              **MR. CORBETT:**  All right.  That's fine.

5    **BY MR. CORBETT:**

6    **Q.**  Did you subsequently form an opinion as to whether or

7    not those games were legitimate or illegitimate, rigged or

8    not rigged?

9    **A.**  Rigged.

10   **Q.**  That was your opinion?

11   **A.**  Yes.

12   **Q.**  Did you communicate that opinion to Mr. Viraldi?

13   **A.**  Yes.

14   **Q.**  Did Mr. Viraldi press you for payment of that

15   obligation?

16   **A.**  Yes.

17   **Q.**  Sir, again, when you moved back to Detroit and you

18   engaged in the card game in Detroit, in addition to

19   Mr. Viraldi, were there any other participants in that game?

20   **A.**  Yes.

21   **Q.**  Do you know a gentleman by the name of Allen Hilf?

22   **A.**  Yes.

23   **Q.**  Was Mr. Hilf involved in that game in the Detroit area?

24   **A.**  In Detroit, yes.

25   **Q.**  Did Mr. Hilf also press you to pay the obligation you

*06-20122; U.S.A. v. Jack V. Giacalone*

1    owed in connection with that debt?

2    **A.**    Yes.

3    **Q.**    Did you have occasion to learn that Mr. Hilf was a

4    bookmaker?

5    **A.**    Yes.

6    **Q.**    Did you have occasion to utilize the services of

7    Mr. Hilf as a bookmaker?

8    **A.**    Yes.

9    **Q.**    Sir, when you were being pressed in connection with

10   this 50 to 75 thousand on the gambling activities in

11   Florida, 50 to 75 thousand of the gambling activities in

12   Michigan, did you ever go to anybody and ask for their

13   advice in connection with this obligation?  Specifically,

14   did you ever go to a gentleman by the name of Joe DeStefano?

15   **A.**    Yes.

16   **Q.**    Approximately when would that have been?

17   **A.**    I don't understand the question.

18   **Q.**    What year?  Approximately what year as best you can

19   recall that?

20   **A.**    Mid '80s.

21   **Q.**    Okay.  And after your conversation with Mr. DeStefano,

22   did you cease being concerned about this financial

23   obligation?

24   **A.**    Yes.

25   **Q.**    Did you subsequently -- so this would have been the mid

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                          14

1    to late '80s.  Did anybody try to collect from you after

2    your conversation with Mr. DeStefano on the card games?

3    **A.**   No.

4    **Q.**   All right.  Did there come a point in time when you

5    left the Detroit metropolitan area?

6    **A.**   Yes.

7    **Q.**   Approximately when?

8    **A.**   I left this area in 1994.

9    **Q.**   And where did you go to when you left here?

10   **A.**   Las Vegas.

11   **Q.**   And were you employed in Las Vegas?

12   **A.**   Yes.

13   **Q.**   And would you tell the ladies and gentlemen of the jury

14   the nature of your employment in Las Vegas?

15   **A.**   I was employed by Hilton Hotels and Casinos.  I worked

16   as a casino host.

17   **Q.**   And would you explain to the ladies and gentlemen of

18   the jury what a casino host does and what his duties are?

19   **A.**   To provide every convenience you can to customers.

20   **Q.**   And how do you get paid?  Do you get paid a salary or a

21   commission or what?

22   **A.**   A salary.

23   **Q.**   All right, sir.  There came a point in time in the

24   summer of 2003 when you had occasion to return to the

25   Detroit metropolitan area; is that correct?

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    15

 1    **A.**    Yes.

 2    **Q.**    And when you returned to the Detroit metropolitan area

 3    did you have occasion to run into Mr. Peter Tocco at a

 4    restaurant?

 5    **A.**    Yes.

 6    **Q.**    Will you explain to the ladies and gentlemen of the

 7    jury the best you can how that happened, what happened?

 8    **A.**    I was having dinner with family and saw Peter Tocco,

 9    and we talked briefly.  He wanted to get together, and I

10    told him, "Call me."

11    **Q.**    And subsequent to that meeting did he call you?

12    **A.**    Yes.

13    **Q.**    And during the course of the conversation did he tell

14    you what he wanted, why he wanted to meet with you?

15    **A.**    Pertaining to some friends he had in Nevada that I

16    might know that it appeared he was seeking a new business

17    venture or something, and I just agreed to meet him.

18    **Q.**    And where did you agree to meet him?

19    **A.**    At the Beach Grill in St. Clair Shores.

20    **Q.**    And did he tell you whether he was going to bring

21    anybody else with him?

22    **A.**    No, he did not.

23    **Q.**    And do you recall going to the Beach Grill on August

24    the 25th, 2003?

25    **A.**    I'm not sure of the date, but yes.

---

*06-20122; U.S.A. v. Jack V. Giacalone*

1  **Q.**   You recall meeting Mr. Peter Tocco at the Beach Grill

2  sometime in the summer of 2003; is that correct?

3  **A.**   Yes.

4  **Q.**   And when you got there what happened?  Who was there

5  when you first arrived at the restaurant?

6  **A.**   Peter Tocco arrived with Dave Aceto.

7  **Q.**   And where did you and Mr. Tocco and Mr. Aceto go when

8  they arrived?

9  **A.**   We sat at a table out on the deck.

10 **Q.**   And, sir, I would like to draw your attention to

11 Defendant's Exhibit Number 1, and this is a floor plan for

12 the Beach Grill, and if this is the portion, the outside

13 portion of the grill, would it be fair to say that you were

14 sitting somewhere in this area?

15         **MR. FINK:**  Objection, leading.

16         **MR. CORBETT:**  All right.

17 **BY MR. CORBETT:**

18 **Q.**   Tell me where you were sitting.

19 **A.**   Right there.

20 **Q.**   All right.  Would you point out for the ladies and

21 gentlemen of the jury?

22 **A.**   Right out here.

23 **Q.**   And who was at that table?

24 **A.**   Peter, Dave and myself.

25 **Q.**   And shortly after you arrived did someone else approach

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                     17

1    the table?

2    **A.**    Yes.

3    **Q.**    Who was that?

4    **A.**    Mr. Giacalone.

5    **Q.**    And did you immediately recognize him?

6    **A.**    No.

7    **Q.**    How is it that you recognized him?  Did someone

8    introduce you or did your memory just get jogged?  What

9    happened?

10   **A.**    My memory just got jogged.

11   **Q.**    Okay.  And when Mr. Giacalone approached the table,

12   what, if anything, did Mr. Aceto and/or Mr. Tocco do?

13   **A.**    They shook hands and left.

14   **Q.**    And you were left there by yourself with Mr. Giacalone?

15   **A.**    Yes.

16   **Q.**    And what, if anything, did Mr. Giacalone say to you?

17   **A.**    He wanted to collect an old gambling debt.

18   **Q.**    Did he specifically reference what that old gambling

19   debt was for?

20   **A.**    No.

21   **Q.**    He didn't say card games?

22   **A.**    More of "you know what it's for."

23   **Q.**    Sir, do you recall testifying in the grand jury in

24   December of 2005?

25   **A.**    Yes.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                                    18

1    **Q.**   Sir, I would like to -- Page 16 -- I would like to draw

2    your attention to the last --

3             **MR. FINK:**   Is this impeachment or refreshment,

4    might I ask?

5             **MR. CORBETT:**   An attempt to refresh his

6    recollection.

7             **MR. FINK:**   He hasn't said he has no recollection.

8    If he wants to impeach him, that's different.

9    **BY MR. CORBETT:**

10   **Q.**   You indicate today that you don't recall a

11   discussion --

12            **MR. FINK:**   Objection, leading.

13            **MR. CORBETT:**   Your Honor, we are going back to

14   something he has already said.

15   **BY MR. CORBETT:**

16   **Q.**   Do you recall a discussion of card games?

17   **A.**   Yes.

18   **Q.**   You do at that meeting?

19   **A.**   Yes.

20   **Q.**   All right.  Would you tell the ladies and gentlemen of

21   the jury how it came up?

22   **A.**   That he wanted to collect on an old debt.

23   **Q.**   Okay.  But did he recognize --

24   **A.**   And I said, "What old debt?"

25   **Q.**   Okay.  And then what did he say, if you know?

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    19

1    **A.**   "From the old card games."

2    **Q.**   Did he tell you how much money he thought you owed him?

3    **A.**   Yes.

4    **Q.**   What did he say?

5    **A.**   300,000.

6    **Q.**   Did he use any adjectives to describe the 300,000?

7    **A.**   Yes.

8    **Q.**   What did he say?

9    **A.**   300 F-ing thousand.

10   **Q.**   How was his demeanor at this point in time?

11   **A.**   His demeanor?

12   **Q.**   Was he calm, cool, collected?  Was he angry?  What was

13   he?

14   **A.**   Angry.

15   **Q.**   Did you make any observations about him physically as

16   he was making these accusations?

17   **A.**   I noticed he was very angry.

18   **Q.**   Did you notice anything about his face, his facial

19   expression?

20   **A.**   That of anger.

21   **Q.**   All right.  Now, did you tell him that you didn't feel

22   there was any debt between you and he?

23   **A.**   Yes.

24   **Q.**   Did he continue to press for the money?

25   **A.**   Yes.

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*

20

1    **Q.**    What did you do then?

2    **A.**    Since I had anticipated being there having a coffee

3    with Pete Tocco and wound up in this situation, my reaction

4    was simply to do my best to get out of there.

5    **Q.**    Sir, in connection with your employment in the casino,

6    did you have any training in this area?

7    **A.**    Yes.

8    **Q.**    And would you tell the ladies and gentlemen of the jury

9    what it is you are trained to do in this kind of a

10   situation?

11   **A.**    When we used to have an angry customer, we tried our

12   best not to have a scene in the casino, and we were taught

13   to speak in a lower tone of voice until we could calm that

14   person down and get them into the office where we could come

15   to some type of a solution.

16   **Q.**    Did you attempt to utilize that same technique with

17   Mr. Giacalone on August 25th, 2003?

18   **A.**    Yes.

19   **Q.**    How did that work out?

20   **A.**    I think quite well.

21   **Q.**    Did you manage to extricate yourself from the

22   restaurant?

23          **MR. FINK:**  Objection to the phrasing of the

24   question.

25          **MR. CORBETT:**  "Extricate" is a perfectly

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*

21

1    legitimate --

2              **THE COURT:**  No, I think it's a little --

3              **MR. FINK:**  Over the top.

4              **THE COURT:**  I didn't say that.  Do you want to

5    answer your own objection?

6              **MR. FINK:**  Yes, although I can't.

7              **THE COURT:**  I don't think that goes with the

8    rules.

9              **MR. FINK:**  I'm sorry, Your Honor.

10             **THE COURT:**  Okay.  Let's rephrase the question.

11   The question is objected to.  We won't go into the details

12   of the reason.  I suggest you rephrase the question.

13             **MR. CORBETT:**  I'll rephrase it.

14   **BY MR. CORBETT:**

15   **Q.**   Did you get out of the restaurant?

16   **A.**   Yes, we --

17   **Q.**   Approximately how long after Mr. Giacalone first sat

18   down to the time you got out of the restaurant, how long

19   transpired, if you know?

20   **A.**   I would say ten minutes from start to finish.  We shook

21   hands and I told him I would get back to him in a week or

22   so, and that was accepted.

23   **Q.**   Did Mr. Giacalone say anything else to you of a

24   personal nature?

25   **A.**   I don't think so.

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    22

1    **Q.**   Do you recall whether or not he mentioned your

2    automobile?

3    **A.**   Oh, yes.  He said I had a nice car.

4    **Q.**   Did he mention anything else?

5    **A.**   And you live in a nice place.

6    **Q.**   Did he say where you lived?  Did he tell you that he

7    knew where you lived?

8    **A.**   Which was a block away at The Shore Club.

9    **Q.**   And what did you interpret that to mean?

10   **A.**   I don't think --

11            **MR. FINK:**  I have a standing objection to this,

12   Your Honor.

13            **THE COURT:**  I understand, but the question --

14            **MR. FINK:**  All right.

15            **THE COURT:**  Repeat the question.  The objection is

16   over--

17            **MR. CORBETT:**  All right.

18            **THE COURT:**  The objection is overruled.

19   **BY MR. CORBETT:**

20   **Q.**   What did you interpret that to mean?

21   **A.**   My goal was to leave.  I don't think I interpreted it

22   one way or the other.

23   **Q.**   Do you recall testifying in the grand jury?

24   **A.**   Yes.

25   **Q.**   Do you recall telling the grand jury something about

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    23

 1    that, if you recall?

 2    **A.**   I don't recall.

 3            **MR. CORBETT:**  Your Honor, I would like to refresh

 4    the witness' recollection.

 5            **THE COURT:**  Go ahead.

 6            **MR. FINK:**  What page?

 7            **MR. CORBETT:**  I'll tell you here in one second.

 8    I've got to find it.

 9            Okay.  It would be Page 18.

10            **MR. FINK:**  Before you do that may I have the

11    opportunity to look at it?

12            **MR. CORBETT:**  Sure.

13            **MR. FINK:**  All right.

14    **BY MR. CORBETT:**

15    **Q.**   Sir, I would like you to start with the second question

16    and read the -- or read the third question, the answer, the

17    fourth question and the answer to yourself.

18            Okay.  Does that refresh your recollection?

19    **A.**   Yes.

20    **Q.**   Based upon your refreshed recollection, would you tell

21    the ladies and gentlemen of the jury what you thought at

22    that point in time when Mr. Giacalone referenced your home

23    and your car?

24    **A.**   You asked if that indicated that he thought I had money

25    and that he knew where I lived, and I said yes, I assume

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*

24

1    that's right.

2    **Q.**    Sir, what was your recollection when Mr. Giacalone made

3    the demand for the money?  Were you apprehensive in any way?

4    **A.**    Yes.

5    **Q.**    Why?

6    **A.**    I wasn't aware of any debt.

7    **Q.**    Were you fearful in any way?

8    **A.**    I would say in shock.

9    **Q.**    Now, you left and you told Mr. Giacalone you would call

10   him back; is that correct?

11   **A.**    Yes.

12   **Q.**    And did you in fact ever call Mr. Giacalone back?

13   **A.**    No, I did not.

14   **Q.**    Did you call anyone else?

15   **A.**    Yes.

16   **Q.**    Who did you call?

17   **A.**    Joe DeStefano.

18   **Q.**    The same gentleman you had spoken to back in the '80s?

19   **A.**    Yes.

20   **Q.**    Did you tell Mr. DeStefano what had happened during

21   your luncheon meeting with Jack Giacalone?

22   **A.**    Yes.

23   **Q.**    And after your conversation with him, did you have a

24   subsequent conversation with him?

25   **A.**    Yes.

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                              25

1   **Q.**   And prior to that conversation with him did you

2   anticipate that you had to get back to Mr. Giacalone on the

3   phone?

4           **MR. FINK:**  Objection.  Just say if he did or

5   didn't.

6           **THE COURT:**  No, the objection is overruled.  Go

7   ahead.

8   **BY MR. CORBETT**

9   **Q.**   Prior to having this second conversation with

10  Mr. DeStefano did you anticipate you were going to have to

11  get back to Mr. Giacalone on the phone?

12  **A.**   Yes.

13  **Q.**   Then you had a second conversation with Mr. DeStefano;

14  is that correct?

15  **A.**   Yes.

16  **Q.**   And after that conversation did you ever call

17  Mr. Giacalone again?

18  **A.**   No.

19          **MR. CORBETT:**  One moment, Your Honor.

20          Your Honor, at this point the Government has no

21  further questions.  I think this probably would be a good

22  time to break for lunch.

23          **THE COURT:**  We are going to recess until 1:00.

24  You ordered lunch, didn't you?  I hope it's here because it

25  may be a few minutes.  Okay?  Until 1:00.  Thank you.

*06-20122; U.S.A. v. Jack V. Giacalone*

1      (Jury out at 11:55 a.m.)

2           THE COURT:  You will have the class come back in

3      my chambers for a couple of minutes.

4           See, I have a phrase here:  "Let us grasp the

5      situation, solve the complicated plot.  Quite, calm

6      deliberation disentangles every knot."

7           How many more witnesses do you have?

8           THE WITNESS:  After this witness I have two more

9      witnesses, and then I am going to recall Agent Johnson.  I

10     actually do think, depending upon the length of

11     Mr. Deseranno's cross-examination, that we will finish

12     today.

13          THE COURT:  Thank you.

14          Thank you.  We are in recess.

15      (Recess from 11:55 a.m. until 1:05 p.m.)

16          THE COURT:  Is the witness here?

17          MR. CORBETT:  Yes, he's out in the hall.  Judge,

18     there's one matter I would like to take up regarding the

19     witness before we proceed.

20          THE COURT:  Go ahead.  Be seated.

21          MR. CORBETT:  As impeachment Mr. Fink has

22     indicated that he may be attempting to inquire into prior

23     bad acts by the defendant not giving rise to conviction.  My

24     understanding is that since he's not a defendant the

25     applicable rule is 608(b), and the alleged misconduct is,

1    the general presumption is that it's excludable.  The Court

2    can in its discretion permit it in, but it's got to be acts

3    dealing specifically with truthfulness or untruthfulness.

4            For instance, I have reason to believe, and I

5    don't know for sure, that Mr. Fink may inquire into an

6    attempt, I don't know, by Mr. Deseranno's ex-wife to get a

7    restraining order against him out of Las Vegas.  I don't

8    think that goes to truthfulness or voracity, and I would

9    object to that kind of a question being asked.

10           **THE COURT:**  Mr. Fink.

11           **MR. FINK:**  I think, you know, the fact that a wife

12   would --

13           **THE COURT:**  No.

14           **MR. FINK:**  -- would get a restraining order does

15   go to his believability as a person, as a witness.

16           **THE COURT:**  No.

17           **MR. FINK:**  Okay.

18           **THE COURT:**  What else?  No, I don't see the fact

19   that he's got domestic problems with his wife goes to

20   truthfulness or --

21           **MR. FINK:**  I won't ask that question, Your Honor.

22           **THE COURT:**  All right.  What else?

23           **MR. FINK:**  I don't know.  I'll go question by

24   question depending on what he says.

25           **THE COURT:**  Mr. Corbett, do you have anything

*Don Julius Deseranno - Direct*
*Wednesday/April 25, 2007*                    28

1    else?

2           **MR. CORBETT:**  Your Honor, that's the only one I am

3    aware of.  I suppose I will be listening anxiously, but

4    while I do think the Court's point, if it's not

5    realistically attributable to the defendant's ability to

6    testify truthfully, and not only that, the presumption is

7    that it's not admissible anyways.

8           **MR. FINK:**  There's no presumption.

9           **MR. CORBETT:**  Well, okay.  Specific instances of

10   the conduct of a witness --

11          **THE COURT:**  For the purpose of attacking or

12   supporting the witness' character for truthfulness other

13   than convictions may not be proved by extrinsic evidence but

14   and may, however, in the discretion of the Court be

15   probative of the truthfulness or untruthfulness be inquired

16   into on cross-examination of the witness concerning the

17   witness' character for truthfulness or untruthfulness.

18   That's it.

19          **MR. CORBETT:**  And I concede that the Court can

20   admit it, but the presumption is it's not going to come in

21   unless there's some overwhelming reason.

22          **MR. FINK:**  There's no presumption.  The only thing

23   is you can't use extrinsic evidence.  There's no

24   presumption.

25          **THE COURT:**  Yeah, but I don't recall in mind

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    29

1    specifically for myself examples of cross-examination under

2    this rule, character for truthfulness or untruthfulness, and

3    I don't know what you are going to ask so I'm not going to

4    say anything, I'm just going to wait, but I would hope that

5    I don't have to deal with objections.  That's all I can say.

6              **MR. CORBETT:**  So do I, Your Honor.

7              We'll have the witness resume the stand before the

8    jury comes in, Your Honor.

9              You can resume the stand, sir.

10             **THE COURT:**  Take the witness stand, please.

11        (Jury in at 1:10 p.m.)

12             **THE COURT:**  Be seated.  You may cross-exam.

13                        -   -   -

14                                        (1:11 p.m.)

15                    **CROSS-EXAMINATION**

16   **BY MR. FINK**

17   **Q.**   Good afternoon, Mr. Deseranno.

18   **A.**   Good afternoon.

19   **Q.**   You testified as to gambling losses, specific losses in

20   the middle to late '80s; is that correct?

21   **A.**   Yes.

22   **Q.**   And then you said you left for Las Vegas in '94; is

23   that correct?

24   **A.**   Yes.

25   **Q.**   You also testified after you talked to Joe D. or

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    30

1   Joe DeStefano you never heard about that debt again; is that

2   correct?

3   **A.**   Yes.

4   **Q.**   When did you talk to him?

5   **A.**   When is the last time I talked to him?

6   **Q.**   No, when did you talk to him during that period before

7   you left for Vegas?  You had talked to him about these

8   alleged debts prior to your moving to Vegas, correct?

9   **A.**   Yes.

10  **Q.**   And I'm asking you prior to Vegas when did you talk to

11  him about those debts, what year?

12  **A.**   I don't remember that.  A pure guess, '89 or '90.

13  **Q.**   Do you remember telling the grand jury at one point at

14  a question by Mr. Corbett --

15          **MR. FINK:**   This is at Page 10, Mr. Corbett.

16          "At approximately that time did you go to a

17  gentleman by the name of Joe DeStefano for help?

18          Answer:  "I'm not sure I knew Joe back then."

19  **BY MR. FINK:**

20  **Q.**   Do you remember giving that answer in response to that

21  question?

22  **A.**   Yes.

23  **Q.**   Then Mr. Corbett referred you to a version that you had

24  given five days earlier to the FBI where you threw

25  Joe DeStefano's name into it; is that correct?  Is that what

*06-20122; U.S.A. v. Jack V. Giacalone*

1    happened in the grand jury, he refreshed your recollection?

2    **A.**    Yes.

3    **Q.**    To the version that you had given to the FBI earlier;

4    is that correct?

5    **A.**    Yes.

6    **Q.**    Now, what did you do during that period of time?  Were

7    you working before you left for Vegas?

8    **A.**    Yes.

9    **Q.**    And where were you working?

10   **A.**    The Cold Heading Company.

11   **Q.**    And you are the beneficiary of an irrevocable trust of

12   $4 million, correct?

13   **A.**    Yes.

14   **Q.**    And you used the interest off of that to gamble with

15   during that period of time; is that correct?

16   **A.**    Yes.

17   **Q.**    Now, Mr. Corbett was asking you how much money you

18   thought you lost during that period of time.  Do you

19   remember that today?

20   **A.**    Yes.

21   **Q.**    Do you remember giving the figure 50 to 100 thousand

22   dollars?

23   **A.**    Yes.

24   **Q.**    That you lost per year; is that correct?

25   **A.**    Yes.

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                                    32

1    **Q.**   Is that the answer you gave today?

2    **A.**   Yes.

3    **Q.**   And do you remember giving these answers in response to

4    these questions in front of the grand jury?

5              **MR. FINK:**   On Page 3, Mr. Corbett, of the

6    supplemental transcript.

7              "Q.  And approximately how much -- could you give

8              us a rough estimate as to how much money you lost

9              gambling at that time?

10             "A.  At that time?

11             "Q.  Yes, ballpark.

12             "A.  Per year?

13             "Q.  Yeah.

14             "A.  300,000 to 500,000 a year betting sports."

15   **BY MR. FINK:**

16   **Q.**   Do you remember giving those answers in response to

17   those questions?

18   **A.**   Yes.

19   **Q.**   Which is true, 50 to 100 thousand or 300,000 to

20   500,000?

21   **A.**   Including Las Vegas gambling and all gambling, more

22   like three to five hundred thousand.

23   **Q.**   So today's answer 50 to 100 thousand is what, that's

24   your --

25   **A.**   Mr. Corbett was pertaining to a specific card game.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    33

1    **Q.**  No, I want to get to the card game.  I'm going to get

2    to the card game.

3           He talked about your losses as a gambler during

4    that period of time.  Don't you remember that?  Separate and

5    distinct from how much you lost at the card games, he asked

6    you how much money you lost betting sports.

7    **A.**  Yes.

8    **Q.**  And your answer was 50 to 100 thousand dollars a year.

9    **A.**  I was referring to a specific card game.

10   **Q.**  A card game that you say you lost 50 to 100 thousand in

11   Florida?

12   **A.**  Yes.

13   **Q.**  And you lost 50 to 100 thousand in Detroit; is that

14   what you said?

15   **A.**  Yes.

16   **Q.**  And do you remember talking to -- do you know this

17   gentleman, Mr. Johnson, Special Agent Johnson?

18   **A.**  Yes.

19   **Q.**  And did you talk to him in Florida five days before

20   your grand jury appearance?

21   **A.**  Yes.

22   **Q.**  And did you tell him you lost 100,000 in Florida and

23   150,000 in Detroit in those two card games?

24   **A.**  I would have said 50 to 100.

25   **Q.**  No.  My question, and tell me if you don't recall

1   giving him that answer or if that answer is not a correct

2   answer and you want to clear it up today, did you tell him

3   that in the game in Florida you lost $100,000 and the game

4   in Detroit you lost $150,000?

5          **MR. CORBETT:**  Your Honor, I'm going to object.  I

6   don't think that's an accurate characterization of the 302.

7          **MR. FINK:**  Well, then I'll get stuck with it when

8   Mr. Johnson testifies if he doesn't think that's accurate.

9   **BY MR. FINK**

10  **Q.**   Did you tell him that?

11  **A.**   I don't know.

12  **Q.**   But, in any event, your testimony in court is 50 to 100

13  thousand on each time; is that correct?

14  **A.**   Yes.

15  **Q.**   Now, how long did you know Mr. Aceto, did you say?

16  **A.**   I guessed about 20 years.

17  **Q.**   Did you know him from high school?

18  **A.**   I don't know where I met Mr. Aceto.

19  **Q.**   Did you tell Agent Johnson you met him in high school?

20  **A.**   I don't think so.  I don't know where he went to high

21  school.

22  **Q.**   In 2005 when you testified in front of the grand jury

23  did you tell the grand jury in response to the question how

24  long have you known Mr. Aceto, did you tell the grand jury

25  under oath you had known him for four or five years off and

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    35

1    on?

2    **A.**    Yes.

3    **Q.**    Was that incorrect?

4    **A.**    Yes -- no, that is correct.

5    **Q.**    As of 2005 you knew him for four or five years?

6    **A.**    Right.

7    **Q.**    And the testimony today about knowing him for 20 years

8    is incorrect?

9    **A.**    That's incorrect.  I'm referring to Pete Tocco that I

10   knew since high school.  I did not know this Dave in

11   high school.  I have only known him four or five years.

12   **Q.**    I understand that, but you were telling us earlier that

13   you have known Dave Aceto for 20 years and then you told me

14   on cross-examination and you testified in the grand jury

15   four or five years.  I'm trying to figure out how long you

16   had known this gentleman.

17   **A.**    I just told you.  I knew Pete Tocco from the high

18   school years.  I have known this Dave some four or

19   five years.

20   **Q.**    And what about the statement you had known him for

21   20 years that you told Mr. Corbett and you told me --

22          **THE COURT:**  Let's move on.

23   **BY MR. FINK**

24   **Q.**    That was incorrect?

25          **THE COURT:**  Mr. Fink, let's move on.

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                           36

1            **MR. FINK:**  All right.

2       **BY MR. FINK:**

3       **Q.**   After you went to see Joe D., you never heard anything

4       about these gambling debts again, did you, until you claim

5       in 2005 -- 2003?

6       **A.**   Yes.

7       **Q.**   That's about an eighteen-year-old gambling debt since

8       the middle '80s to 2003; is that correct?

9       **A.**   Yes.

10      **Q.**   You lived in Las Vegas, correct?

11      **A.**   Yes.

12      **Q.**   And you weren't hiding, were you?

13      **A.**   No.

14      **Q.**   Did you own your own home?

15      **A.**   Yes.

16      **Q.**   Was it in your name?

17      **A.**   It was owned by my trust.

18      **Q.**   Was it owned by your son and a lawyer by the name of

19      Thomas?

20      **A.**   Thomas' name is on the trust, not my son.

21      **Q.**   And that was sheltered from creditors, was it not?

22            **MR. CORBETT:**  I'm going to object to the

23      relevance.

24            **MR. FINK:**  I'll move on.  Well, he's the one that

25      brought up he lived in Vegas.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                          37

1          **THE COURT:**  Mr. Fink, please, please.

2          **MR. FINK:**  I'll move on.

3          **THE COURT:**  No editorial comment.  Just ask your

4    question.

5    **BY MR. FINK:**

6    **Q.**   You weren't hiding in Vegas; is that correct?

7    **A.**   No, I was not hiding in Vegas.

8    **Q.**   And did you work on the floor as a host?

9    **A.**   Yes.

10   **Q.**   And for what period of time, from what period --

11   Mr. Corbett brought out the fact that you were a host.

12   During what period?

13   **A.**   Approximately 1994 until 2002.

14   **Q.**   And is that when you ceased being a host?

15   **A.**   Yes.

16   **Q.**   And what was the reason you ceased being a host?

17   **A.**   Got bored.

18   **Q.**   Did you have a license up until 2002?

19   **A.**   Yes.

20   **Q.**   Do you know what a bust-out scheme is?

21   **A.**   I'm sorry?

22   **Q.**   A bust-out scheme.

23   **A.**   No.

24   **Q.**   Where you borrow $100,000 say from each casino and then

25   you go bankrupt?

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                              38

1   **A.**   I never heard of that.

2   **Q.**   That's what you did though, isn't it?

3   **A.**   That's what I -- yes, that's what I did.

4   **Q.**   And during your time in Vegas you used this man's

5   father's name when you had a problem, did you not?

6   **A.**   I did not.

7   **Q.**   Did you cheat -- do you know Phil Mickelson, the

8   golfer?

9   **A.**   Who?

10  **Q.**   Phil Mickelson, the golfer.

11  **A.**   Yes.

12  **Q.**   Lefty?

13  **A.**   Yes.

14  **Q.**   Did you cheat him out of $500,000?

15  **A.**   I wouldn't say I cheated him.

16  **Q.**   What would you call it?  What did you do?

17  **A.**   I couldn't pay him.

18  **Q.**   You booked his action, correct?

19  **A.**   Yes.

20  **Q.**   So you were a bookmaker in Vegas in addition to being a

21  host; is that correct?

22  **A.**   Yes.

23  **Q.**   When you were approached by Special Agent Johnson, that

24  was the first time you had been approached by an FBI agent,

25  is that correct, for information regarding your activities?

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                               39

1   **A.**   Yes.

2   **Q.**   Okay.  That has to be a little bit unnerving, is it

3   not?

4   **A.**   Yes, it is.

5   **Q.**   Okay.  And when he asked you about the meeting that

6   took place on August 25th, 2003, you told him that my client

7   was there to collect a debt and you said he wanted his

8   $600,000.  Do you remember telling him that?

9   **A.**   I thought it was $300,000.

10  **Q.**   Well, it was 350,000 in front of the grand jury; is

11  that correct?

12  **A.**   I don't recall.

13  **Q.**   Would the grand jury transcript refresh your

14  recollection as to the figure you gave in the grand jury

15  room?

16  **A.**   Sure.

17          **MR. FINK:**  May I approach the witness, Your Honor?

18          **THE COURT:**  Sure.

19          **THE WITNESS:**  What am I reading?

20          **THE COURT:**  Read to yourself, please.

21          Now ask your question, Mr. Fink.

22  **BY MR. FINK:**

23  **Q.**   Have you had an opportunity to read that page?

24  **A.**   Yes.

25          **MR. FINK:**  That's at Page 16, Mr. Corbett.

---

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*

40

1        **MR. CORBETT:**  Yes.

2    **BY MR. FINK:**

3    **Q.**   Is your recollection refreshed as to what you testified

4    to in front of the grand jury?

5    **A.**   Yes.

6    **Q.**   In front of the grand jury you said 350,000 you said he

7    wanted?

8    **A.**   Yes.

9    **Q.**   And here you said 300,000; is that correct?

10   **A.**   Yes.

11   **Q.**   And to Agent Johnson you said 600,000; is that correct,

12   if you recall?

13   **A.**   I don't recall.

14   **Q.**   As a host in Las Vegas when you were working on the

15   floor, you would bring people in from Detroit, would you

16   not, amongst other places?

17   **A.**   Yes.

18   **Q.**   And these people were obviously gamblers, correct?

19   **A.**   Yes.

20   **Q.**   And you explained what a host does, tends to their

21   needs in Vegas; is that correct?

22   **A.**   Yes.

23   **Q.**   So a lot of these people were big players?

24   **A.**   Some.

25   **Q.**   Do you know the expression "whale"?

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    41

1    **A.**   Yes.

2    **Q.**   What does that mean?

3    **A.**   A big player.

4    **Q.**   Okay.  Did any of these people ever carry a message to

5    you from Mr. Giacalone?

6    **A.**   No.

7    **Q.**   Did you ever use Mr. Giacalone's father's name in Vegas

8    ever?

9    **A.**   No.

10   **Q.**   Now, you met Mr. Tocco in a restaurant in 2003, is that

11   correct, when you were here for your daughter's wedding?

12   **A.**   Yes.

13   **Q.**   Lucciano's?

14   **A.**   Yes.

15   **Q.**   It's a place you frequent?

16   **A.**   We had dinner there, yes.

17   **Q.**   And Mr. Tocco approached you, did he not?

18   **A.**   Yes.

19   **Q.**   And he approached you at Lucciano's?

20   **A.**   Yes.

21   **Q.**   You hadn't talked to him in how long?

22   **A.**   I probably haven't seen Mr. Tocco three times in

23   30 years.

24   **Q.**   Did you know anything about him back then, in 2003?

25   Did you know what he did for a living?

---

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                                    42

1    **A.**    The last I knew is he owned some -- I think he ran some

2    parking lots here in Detroit.

3    **Q.**    And so when he came up to you and said hello, you were

4    friendly; is that correct?

5    **A.**    Yes.

6    **Q.**    And what was the nature of that conversation at

7    Luciano's?

8    **A.**    And he was interested in some information pertaining to

9    what it's like living in Las Vegas, that he was thinking of

10   moving there, I assume, starting a business and he had some

11   friends out there that I could maybe help him locate.  And I

12   said, "Well, Pete, not now.  I'm having dinner.  Call me."

13   And we shook hands, and that was the end of that.

14   **Q.**    Was there anything about him getting involved in gaming

15   or licensing?

16   **A.**    Not that I recall.

17   **Q.**    Do you remember in the grand jury being asked about --

18   **A.**    Oh, yeah.  I'm sorry, Peter did ask me if I was

19   licensed, and I said yes.

20   **Q.**    What was your impression of Peter being able to get

21   licensed?

22   **A.**    I assumed he would go through the same qualifications

23   that I did.

24   **Q.**    Did you tell the grand jury that you originally never

25   thought he would get licensed because his last name ended in

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                      43

1    an "O"?

2            **MR. CORBETT:**  Your Honor, I suggest that's not

3    what the grand jury says.

4            **THE COURT:**  I think if you're going to reference

5    grand jury testimony in this context what you should do is

6    read the question and read the answer and don't characterize

7    it.

8            **MR. FINK:**  Mr. Corbett, I concede, is correct.

9    **BY MR. FINK:**

10   **Q.**   Your answer was, "I never originally thought I would

11   get licensed simply because my last name ended in an "O."

12   Is that correct?

13   **A.**   Yes, I said that.

14   **Q.**   What did you mean by that?

15   **A.**   Him being Italian, that my name also ended in an "O."

16   **Q.**   But you are not Italian?

17   **A.**   I'm 100 percent Belgium.

18   **Q.**   Your dad was the ambassador to Belgium, wasn't he?

19   **A.**   The Belgium consolate, yes.

20   **Q.**   What do you do now?

21   **A.**   I am writing.

22   **Q.**   Do you know a man named Roger King?

23   **A.**   Yes.

24   **Q.**   Did you work with him?

25   **A.**   I have never worked with him, no.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                              44

1    **Q.**   Did he give you money from time to time?

2    **A.**   No.

3    **Q.**   Had you procured things for him from time to time?

4    **A.**   I was his host on a couple of occasions.

5    **Q.**   He's the head of King World, isn't he?

6    **A.**   Yes.

7    **Q.**   Did you procure women for him?

8              **MR. CORBETT:**  I'm going to object, Your Honor.

9              **THE COURT:**  What's the arguable relevancy of that?

10             **MR. FINK:**  Because Mr. Corbett opened the door by

11   talking about what a host does, and I think it's a little

12   more expansive than what he said.

13             **MR. CORBETT:**  Your Honor, I suggest that this is,

14   as we discussed earlier, impeachment and the question is

15   does it go to truthfulness and voracity, and under 608 it

16   suggests it's an improper question and Mr. Fink knows that.

17             **MR. FINK:**  Well, I'm trying to --

18             **THE COURT:**  I sustain the objection.

19   **BY MR. FINK:**

20   **Q.**   To this day that debt has never been paid; is that

21   correct?

22   **A.**   What debt?

23   **Q.**   The debt that you went to, according to you, that you

24   went to Joe DeStefano about back in the late '80s?

25   **A.**   As far as I know, that was all settled.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Cross*
*Wednesday/April 25, 2007*                    45

1   **Q.**   As you left the Beach Grill that day, did you shake

2   hands with Mr. Giacalone?

3   **A.**   Yes, I did.

4   **Q.**   Were there smiles exchanged?

5   **A.**   Yes.

6   **Q.**   And did you tell him you wanted to leave, right, you

7   didn't want to see Allen; is that correct?

8   **A.**   Well, I was pressed for time, also.

9   **Q.**   You were pressed for time.  Did you tell him to tell

10  Pete you'll call him?

11  **A.**   Yes.

12  **Q.**   And you left, correct?

13  **A.**   Yes.

14  **Q.**   That's the last you ever heard of him?

15  **A.**   Yes.

16  **Q.**   Until 2005?

17  **A.**   Yes.

18  **Q.**   Is it a fair statement as you sit here today that you

19  never were frightened about that debt from the time you left

20  Las Vegas until now?

21  **A.**   I'm sorry?

22  **Q.**   You are not frightened today, are you?

23  **A.**   Frightened?

24  **Q.**   Yeah.

25  **A.**   No.

*06-20122; U.S.A. v. Jack V. Giacalone*

1          **MR. FINK:**  Thank you.  Nothing further.

2          **THE COURT:**  Redirect.

3                         -   -   -

4                     **REDIRECT EXAMINATION**

5     **BY MR. CORBETT:**

6     **Q.**   Mr. Fink asked you if you were frightened today.  Were

7     you frightened or apprehensive on the day Mr. Giacalone

8     approached you for the money and asked you for the $350,000

9     or his F-ing 350,000?

10    **A.**   As I said, I was very uncomfortable and thought the

11    best approach was to leave.

12    **Q.**   And you spoke about the training you received at the

13    casino to diffuse situations.  Do you recall that testimony?

14    **A.**   Yes.

15    **Q.**   And is that the way you attempted to deal with

16    Mr. Giacalone on that day?

17    **A.**   Yes.

18    **Q.**   And is that why at the conclusion of the meeting you

19    shook hands with him and appeared to be smiling and friendly

20    with him?

21    **A.**   Yes.

22    **Q.**   Were you anxious to get as far away from that place as

23    you could at that point in time?

24    **A.**   Yes.

25    **Q.**   Now, Mr. Fink asked you a question if you had ever used

*Don Julius Deseranno – Redirect*
*Wednesday/April 25, 2007*

47

1    the name of Jack Giacalone's father; do you recall that

2    question?

3    **A.**   Yes.

4    **Q.**   First of all, do you know who Jack Giacalone's father

5    is?

6    **A.**   No.

7    **Q.**   Have you ever heard of a gentleman by the name of

8    Billy Giacalone or Vito Giacalone?

9    **A.**   I have heard of the name, yes.

10   **Q.**   You have never used that name?

11   **A.**   No.

12   **Q.**   Why would you use that name?  Why would Mr. Fink think

13   that you would use that name?

14          **MR. FINK:**  Objection to the question.

15          **THE COURT:**  Well, you are asking him why Mr. Fink

16   would ask him a question?

17          **MR. CORBETT:**  All right.  Let me rephrase it.

18   **BY MR. CORBETT:**

19   **Q.**   Do you have any idea why someone, you or someone else,

20   would use the name of Billy Giacalone?

21   **A.**   No.

22   **Q.**   Does he have a reputation?

23   **A.**   Yes.

24          **MR. FINK:**  Objection.

25

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Redirect*
*Wednesday/April 25, 2007*                    48

1    **BY MR. CORBETT:**

2    **Q.**   Are you aware of that?

3    **A.**   I would say that last name has a reputation, yes.

4    **Q.**   But you never used that reputation to get yourself out

5    of any trouble?

6    **A.**   No.

7            **MR. CORBETT:**   One moment, Your Honor.

8    **BY MR. CORBETT:**

9    **Q.**   I think Mr. Fink asked you a question about the

10   interview with Special Agent Johnson and asked you if you

11   had told him that you had lost $250,000.  Do you recall that

12   series of questions?

13   **A.**   Yes.

14   **Q.**   And do you recall whether or not -- now, when you spoke

15   to the agent, you were talking to him not only about

16   gambling losses incurred in connection with a card game, but

17   also about gambling losses incurred in connection with

18   sports bookmaking, is that correct, when you were talking to

19   Agent Johnson?

20   **A.**   Yes.

21   **Q.**   Now, there's been a lot of discussion about the amount

22   of money, whether you said 300,000, 600,000, 350,000 in

23   terms of questions asked to you by Mr. Fink.  Do you recall

24   that?

25   **A.**   Yes.

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Redirect*
*Wednesday/April 25, 2007*                    49

1   **Q.**   The first question, do you feel you owe anybody any

2   money at all in connection with the card games that took

3   place in Florida and in Michigan?

4   **A.**   No.

5   **Q.**   Why not?

6   **A.**   That was all settled some 20 years ago to the best of

7   my recollection.

8   **Q.**   And was it settled in part because of your

9   understanding of the honesty of those games?

10         **MR. FINK:**   Objection.  He answered the question

11  and it's leading.

12         **THE COURT:**   Well, the objection is overruled.  If

13  that's the objection, it's overruled.

14         **MR. FINK:**   It's leading.

15         **THE COURT:**   That's something else again.  That

16  I'll sustain.

17  **BY MR. CORBETT:**

18  **Q.**   Did you have an opinion as to whether it was a fair or

19  an unfair game?

20         **MR. FINK:**   Objection.  It's been asked and

21  answered on direct.  It wasn't gone into on cross.

22         **THE COURT:**   I think it's already been asked and

23  answered.

24         **MR. CORBETT:**   All right.

25

---

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Redirect*
*Wednesday/April 25, 2007*                    50

1   **BY MR. CORBETT:**

2   **Q.**   Is it fair to say that the exact amount of money

3   involved is something that as you sit here today you have no

4   clear recollection of?

5   **A.**   That's true.

6   **Q.**   Was the amount of money that Mr. Giacalone requested

7   from you on August 25th, 2003 a large sum of money?

8   **A.**   Yes.

9   **Q.**   And that was a large sum of money tied to the card game

10  going back to the --

11          **MR. FINK:**  Who is testifying here?

12          **MR. CORBETT:**  Was that --

13          **THE COURT:**  Well, we've been --

14          **MR. FINK:**  This was asked and answered.

15          **THE COURT:**  There is a tendency at some point to

16  start repeating, and I don't think it's really necessary.

17          **MR. CORBETT:**  All right.  I'll move on,

18  Your Honor.

19          **THE COURT:**  Thank you.

20  **BY MR. CORBETT:**

21  **Q.**   Just to clarify one thing.  How long have you known --

22  let's go through these names.  How long have you known

23  Peter Tocco?

24  **A.**   Since my high school days.

25  **Q.**   Okay.  And if you don't mind my asking, when were your

*06-20122; U.S.A. v. Jack V. Giacalone*

*Don Julius Deseranno - Redirect*
*Wednesday/April 25, 2007*                    51

1   high school days?

2   **A.**   I graduated from high school in 1962.

3   **Q.**   All right.  So you have known Peter Tocco for a period

4   of approximately 45 or more years?

5   **A.**   Yes.

6   **Q.**   How long have you known Dave Aceto for?

7   **A.**   I don't recall when or where I met Dave Aceto, but as I

8   stated, five or six years.

9   **Q.**   How long have you known Jack V. Giacalone?

10  **A.**   I don't recall when I met Mr. Giacalone.

11  **Q.**   Can you give us an approximation?

12          **MR. FINK:**   This has been asked and answered on

13  direct, Your Honor.

14          **MR. CORBETT:**   Your Honor, Mr. Fink made a large

15  deal about this.

16          **MR. FINK:**   No, I didn't.  That never came up.

17          **THE COURT:**   The objection is overruled.

18  **BY MR. CORBETT:**

19  **Q.**   To the best of your knowledge, approximately when did

20  you meet Mr. Giacalone?

21  **A.**   In the '80s, some 20 years ago.

22  **Q.**   All right.  And approximately how long have you known

23  Allen Hilf?

24  **A.**   The same.

25  **Q.**   Did you meet Mr. Giacalone and Mr. Hilf at

*Don Julius Deseranno - Redirect*
*Wednesday/April 25, 2007*                    52

1    approximately the same time?

2    **A.**    I knew Mr. Hilf before I met Mr. Giacalone.

3              **MR. CORBETT:**  I have no further questions.

4              **THE COURT:**  The witness is excused.  Thank you,

5    sir.  You may step down.

6              **THE WITNESS:**  Thank you, Your Honor.

7         (End of excerpt.)

8                           -    -    -

9                  **C E R T I F I C A T I O N**

10             I certify that the foregoing is a correct

11   transcription of an excerpt of the record of proceedings in

12   the above-entitled matter.

13

14   s/ Sheri K. Ward_____              10/12/2007
     Sheri K. Ward                       Date
15   Official Court Reporter

16                           -    -    -

17

18

19

20

21

22

23

24

25

*06-20122; U.S.A. v. Jack V. Giacalone*